**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No.  CC-15-1037-KiTaKu |
| ) | |
| WHITNEY BRENDAN COOKE, ) | Bk. No.  12-14393-PC |
| ) | |
| Debtor. ) | Adv. No.  13-01062-PC |
| _____ ) | |
| ) | |
| WHITNEY BRENDAN COOKE, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **M E M O R A N D U M**[1] |
| ) | |
| JAMES RENSHAW, ) | |
| ) | |
| Appellee. ) | |
| _____ ) | |

Argued and Submitted on November 19, 2015,
at Pasadena, California

Filed - July 22, 2016

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Peter H. Carroll, Bankruptcy Judge, Presiding

_____

Appearances:     Yi Sun Kim of Greenberg & Bass LLP argued for
appellant Whitney Brendan Cooke; Randy E. Wells of
Law Office of Ball & Yorke argued for appellee
James Renshaw.

_____

Before:   KIRSCHER, TAYLOR and KURTZ, Bankruptcy Judges.

Memorandum by Judge Kirscher
Dissent by Judge Taylor

_____

[1]  This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have, it has no precedential value.  See 9th Cir. BAP Rule 8024-1.

Debtor Whitney Brendan Cooke appeals a judgment denying his discharge under § 727(a)(2)(A).[2]  The bankruptcy court found that Cooke had spent certain funds he received just days before filing bankruptcy with the intent to hinder or delay his judgment creditor, appellee James Renshaw.  We AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**A.  Prepetition events**

In January 2011, Cooke and Renshaw were in an automobile and motorcycle accident in Ojai, California.  Renshaw, a former fireman, was seriously and permanently injured.  Cooke was a seventeen year-old high school student at the time of the accident; he is now a full-time student at UCLA.  Cooke was insured by an automobile policy through Allied Nationwide Insurance Company ("AMCO") with a liability coverage limit of $250,000.

Renshaw filed a state court action against Cooke for negligence in connection with the accident.  AMCO retained attorney Jim Hart ("Hart") to defend Cooke.  After trial, the jury found Cooke liable for the accident.  The state court entered a judgment on July 11, 2012, awarding Renshaw $1,681,527.89, plus costs and interest ("Judgment").  A significant portion of the award was for Renshaw's past and future medical bills.

On October 12, 2012, AMCO paid directly to Renshaw the policy limits of $250,000.  This payment left Cooke liable for the excess judgment.

---

[2]  Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

Cooke's AMCO policy provided that certain supplemental payments would be made on behalf of the insured, including payment of postjudgment interest to the insured. Specifically, the "Supplementary Payment" provision stated, in pertinent part:

> In addition to our limit of liability, we will pay on behalf of an "insured:"
>
> 3. Interest accruing after a judgment is entered in any suit we defend. Our duty to pay interest ends when we offer to pay that part of the judgment which does not exceed our limit of liability for this coverage.

By the time AMCO made the $250,000 payment to Renshaw, the total amount of interest accrued on the Judgment was $45,147.62.

Concurrently with the state court action against Cooke, Renshaw sued AMCO in late July 2012, in part, to determine whether Renshaw could recover postjudgment interest and costs directly from AMCO. During briefing, AMCO argued, under California law, that a judgment creditor could not recover postjudgment interest and costs in a direct action. Renshaw dismissed his suit against AMCO on October 29, 2012, before any ruling was made.

On November 13, 2012, AMCO sent a letter to Cooke's home address regarding the postjudgment interest of $45,147.62 ("AMCO Letter"). The AMCO Letter stated, in pertinent part:

> James Renshaw recently sued [AMCO] and contended he was entitled to receive post-judgment interest under the policy which insured you in connection with the above-referenced loss. In connection with responding to Mr. Renshaw's claims, AMCO determined **you are entitled** to receive post-judgment interest pursuant to the SUPPLEMENTARY PAYMENTS provision of the insurance policy. . . . .
>
> **As such, we will be issuing you a check under separate cover in the amount of $45,147.62.** Because Mr. Renshaw dismissed his lawsuit against AMCO based on our position the post-judgment interest is owed to you rather than Mr. Renshaw, **we believe it is likely Mr. Renshaw will presume AMCO is paying you post-judgment interest and**

-3-

**will try to recover this amount from you.** We recommend you provide this correspondence to personal counsel who is assisting you with the judgment collection issues to verify he or she agrees with the interest calculation and to provide you advice regarding disposition of these funds in light of the judgment which was entered against you in excess of policy limits.

(emphasis added). A copy of the AMCO Letter was also sent to Cooke's mother, Pamela Cooke ("Pamela"),[3] and Hart.

Shortly thereafter (or concurrently with the AMCO Letter), AMCO sent to Cooke's home address a check payable to him for $45,147.62 ("AMCO Payment"). Pamela forwarded the AMCO Letter and AMCO Payment to Cooke at his UCLA residence.

On November 19, 2012, Cooke deposited the AMCO Payment in his only checking account. Between November 19 and 28, 2012, Cooke spent approximately $30,000 of the AMCO Payment on the following:

| | |
|---|---|
| $1,040 | Cash for miscellaneous items (Nov. 19) |
| $5,600 | UCLA Housing for upcoming quarter (Nov. 21) |
| $4,670 | UCLA Tuition & Fees for upcoming quarter (Nov. 23) |
| $11,000 | IRS for taxes owed on the AMCO Payment (Nov. 23) |
| $4,306 | Bankruptcy attorney and filing fees (Nov. 26) |
| $2,800 | California Franchise Tax Board for taxes owed on the AMCO Payment (Nov. 26) |
| $2,500 | Computer (Nov. 27) |

**B.    Postpetition events**

Eleven days after depositing the AMCO Payment, Cooke filed a chapter 7 bankruptcy case on November 30, 2012. He disclosed the AMCO Payment and the transfers he made with the funds. Cooke also disclosed the remaining $14,250 from the AMCO Payment in his

---

[3] We refer to Cooke's mother as Pamela to avoid any confusion. No disrespect is intended.

-4-

checking account, which he claimed exempt. Renshaw was listed as one of Cooke's three unsecured creditors. The other two creditors were owed less than $600.00 combined.

**1. Cooke's testimony at his § 341(a) meeting**

With respect to the AMCO Letter and AMCO Payment, Cooke testified at his first § 341(a) meeting of creditors on January 22, 2013, that he had received a check for $45,147.62 from AMCO, but that he "d[idn't] exactly know" what it was for, and that he "wasn't informed by [his] lawyer exactly what it was from." Cooke further testified:

Q. You didn't ask what [the AMCO Payment] was for?

A. I think it was for – trying to think what the interest – there was some interest on some of it.

Q. Interest on what?

A. I – they didn't – I think it was for – my insurance didn't pay – make a payment as soon as possible and so I, for some reason, got the money. I don't know exactly why.

Q. You got a check for $44,000. You don't know what you got it for? Is that what your –

A. I didn't ask too many questions.

. . . .

Q. Did you ever ask [Hart] what the check was for?

A. Not really.

Q. Did you ever ask anyone what the check was for? When did you receive the check?

A. I probably (indiscernible).

**2. Cooke's testimony at his Rule 2004 examination**

On March 13, 2013, two months after Cooke's first § 341(a) meeting, Cooke appeared and testified under oath in a Rule 2004 examination conducted by Renshaw. Cooke testified that he did not

-5-

recall receiving the AMCO Letter or that Pamela had forwarded it to him at UCLA. He did testify, however, that prior to depositing the AMCO Payment he inquired as to why he received it and that he had relied upon Hart's advice to conclude the money belonged to him and not Renshaw. Cooke admitted he contemplated filing bankruptcy prior to depositing the AMCO Payment. Cooke also testified he knew that the AMCO Payment represented interest accrued from Renshaw's Judgment, that Renshaw might try to collect the money and that he could have given the money to Renshaw but elected to use the money for other purposes.

### 3. Renshaw's adversary complaint

Renshaw filed an adversary complaint against Cooke, seeking to deny his discharge under § 727(a)(2)(A).[4] Renshaw claimed the AMCO Payment belonged to him because it was accrued interest on the Judgment and contended that Cooke should have earmarked the money for payment to Renshaw. However, rather than turning the funds over to him, Renshaw alleged that Cooke wrongfully spent them to avoid paying him. In his answer, Cooke admitted spending some of the AMCO Payment days before filing for bankruptcy, but denied that he spent the funds to avoid paying Renshaw.

In Cooke's declaration submitted on November 27, 2013, with his motion for summary judgment, Cooke stated that before he deposited the AMCO Payment: (1) he reviewed the AMCO Letter; (2) he was told by Pamela that she had verified Cooke's

---

[4] Renshaw also sought other claims for relief, including § 727(a)(2)(B), (a)(3), (a)(4) and (a)(5). The bankruptcy court granted Cooke summary judgment on those claims; his motion was denied as to Renshaw's § 727(a)(2)(A) claim, which went to trial and is the only claim at issue on appeal.

entitlement to the funds and that he could spend them whichever way he chose; (3) Hart had also told Cooke the funds belonged to him to use in any manner; and (4) he relied on the statements from AMCO, Pamela and Hart and believed he could use the money for his own purposes.

### 4.   The trial, ruling and judgment

Renshaw contended in his trial brief that Cooke had knowingly and intentionally spent the AMCO Payment to hinder, delay or defraud him in his ability to collect on the Judgment.  Renshaw argued that to the extent Cooke was relying on a good faith defense of advice of counsel that he could spend the funds, Cooke was precluded from doing so because he continued to assert the attorney-client privilege to prevent Renshaw from discovering the precise advice given by Hart.  Notably, no declaration was ever offered from attorney Hart.

In his trial brief, Cooke argued that he had repeatedly testified as to his reliance on the statements made in the AMCO Letter and on the advice of Pamela and Hart that the AMCO Payment was postjudgment interest to which he was entitled and to which he could use in whichever manner he chose.  Cooke contended he, not Renshaw, was the intended beneficiary of the contract provision in his auto policy for postjudgment interest and, thus, the money paid to him by AMCO was his money.  Regardless, argued Cooke, Renshaw could not show that he had the requisite intent to hinder, delay or defraud Renshaw.  No evidence suggested that Cooke had reason to believe the AMCO Payment was being made to him in trust for subsequent transfer to Renshaw.  Even though the AMCO Letter stated that Renshaw may "try to recover" the funds, Cooke argued

it was reasonable for him to believe they belonged to him, not Renshaw, since the AMCO Letter advised that Renshaw was not able to recover the postjudgment interest directly from AMCO.

### a. The trial

Trial on the matter of the AMCO Payment and Cooke's discharge proceeded. Renshaw, Cooke and Pamela testified. Cooke testified that he had reviewed the AMCO Letter and discussed it with Pamela before depositing the AMCO Payment. Renshaw's counsel then proceeded to read into the record Cooke's testimony from his Rule 2004 examination, which differed from this trial testimony. Cooke further testified that he made inquiries to Hart, Pamela and AMCO about what the AMCO Payment was for before depositing it. Renshaw's counsel then played a portion of the audio file from Cooke's first § 341(a) meeting, which contradicted Cooke's current testimony.

Under questioning at the trial by Renshaw's counsel, Cooke testified:

Q. Okay. Isn't it true that you did not want Mr. Renshaw to have the money received from AMCO?

A. Everyone I asked told me it was my money.

Q. I'm not – I'm asking you. Isn't it true that you did not want Mr. Renshaw to have the interest money?

A. That's not true.

Q. Well, if it was true, wouldn't you have given it to him?

A. From my counsel and the insurance told me, he might try to collect on it.

. . . .

Q. Okay. And if you wanted Mr. Renshaw to have

-8-

that money, you could have given Mr. Renshaw that money. Isn't that true?

A. Yes.

Q. But you didn't, did you?

A. No.

Q. Because you didn't want Mr. Renshaw to have that money. Isn't that true?

A. I was told it was my money.

Q. I'm sorry. Excuse me. You didn't want Mr. Renshaw to have that money, did you?

A. I didn't . . . .

Trial Tr. (Jan. 12, 2015) 52:13-22, 53:9-20.

Under questioning by Cooke's counsel, Cooke testified:

A. Did anyone ever tell you that it had to be paid over to Mr. Renshaw?

Q. No. They told me he might try to collect on it, but it was my money.

Id. at 59:8-11.

Cooke also testified that up until this point Pamela had paid his UCLA tuition and living expenses and that he was not responsible for reimbursing her for those expenses. Cooke testified that he had never paid these expenses before because he had no money of his own. However, he decided to pay them this time to help out Pamela.

Pamela testified that she spoke with Hart about the AMCO Letter and AMCO Payment and confirmed with Hart that the money belonged to Cooke. She then relayed that information to Cooke. Pamela testified that she also sought independent legal advice from Laura Bartels and that Ms. Bartels essentially confirmed Pamela's understanding that the money belonged to Cooke.

-9-

After hearing closing arguments from the parties, the bankruptcy court took the matter under submission.

### b. The bankruptcy court's ruling and judgment

The bankruptcy court found that the AMCO Payment was property of the debtor and that all of Cooke's transfers of funds occurred within one year prior to his bankruptcy filing. The court further found that Cooke intended to hinder or delay Renshaw in his ability to collect on the Judgment by transferring the funds. Based on the totality of the circumstances, the court believed Cooke's transfers went beyond legitimate prebankruptcy planning and were done with the intent to keep the funds from Renshaw, his most significant creditor, and to maximize the benefit of the funds received for himself. Cooke timely appealed the judgment denying his discharge under § 727(a)(2)(A).

### II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(J). We have jurisdiction under 28 U.S.C. § 158.

### III. ISSUE

Did the bankruptcy court err when it denied Cooke's discharge under § 727(a)(2)(A)?

### IV. STANDARDS OF REVIEW

In an action for denial of discharge, we review: (1) the bankruptcy court's determinations of the historical facts for clear error; (2) its selection of the applicable legal rules under § 727 de novo; and (3) its application of the facts to those rules requiring the exercise of judgments about values animating the rules de novo. Searles v. Riley (In re Searles), 317 B.R. 368, 373 (9th Cir. BAP 2004), aff'd, 212 F. App'x 589 (9th Cir. 2006).

-10-

The bankruptcy court's determinations concerning the debtor's intent are factual matters reviewed for clear error. Beauchamp v. Hoose (In re Beauchamp), 236 B.R. 727, 729 (9th Cir. BAP 1999). Factual findings are clearly erroneous if they are illogical, implausible or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010). We give great deference to the bankruptcy court's findings when they are based on its determinations as to the credibility of witnesses. Id. (noting that as the trier of fact, the bankruptcy court has "the opportunity to note variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."). If two views of the evidence are possible, the trial judge's choice between them cannot be clearly erroneous. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-75 (1985); Ng v. Farmer (In re Ng), 477 B.R. 118, 132 (9th Cir. BAP 2012).

**V. DISCUSSION**

The party objecting to a debtor's discharge under § 727(a) bears the burden of proving by a preponderance of the evidence that the debtor's discharge should be denied. In re Retz, 606 F.3d at 1196. Courts are to "'construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge.'" Id. (quoting Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281 (9th Cir. 1996)).

The bankruptcy court denied discharge under § 727(a)(2)(A) based on Cooke's prepetition disposition of the AMCO Payment. On appeal, Cooke argues: (1) no evidence was presented to prove his actual intent to defraud; all evidence showed that he had no

-11-

intent to defraud or delay Renshaw; (2) no badges of fraud were present; (3) he acted in good faith, which negates any possible badges of fraud; (4) prebankruptcy planning by converting nonexempt assets to exempt assets on the eve of bankruptcy is not in and of itself sufficient to prove fraud; and (5) the bankruptcy court misapplied In re Bernard.

**A.    The bankruptcy court did not err when it denied Cooke's discharge under § 727(a)(2)(A).**

      **1.    Denial of discharge under § 727(a)(2)(A)**

Section 727(a)(2)(A) provides that the bankruptcy court may deny a debtor's discharge if the debtor has disposed of his or her property, with the intent to hinder, delay or defraud a creditor, within one year prior to the petition date.  The party objecting to discharge under § 727(a)(2)(A) must prove two things:  (1) the disposition of property, whether by transfer, removal, destruction, mutilation or concealment (within the statutory time period); and (2) the debtor's subjective intent to hinder, delay or defraud a creditor through the act of disposition of the property.  In re Retz, 606 F.3d at 1200 (citing Hughes v. Lawson (In re Lawson), 122 F.3d 1237, 1240 (9th Cir. 1997)).  Cooke concedes and does not contest the bankruptcy court's findings that the AMCO Payment was Cooke's property and that the subject transfers of funds were within one year of the petition date. This appeal does not require a determination that Cooke acted with fraudulent intent to defraud Renshaw.  As the statutory language is disjunctive, it is sufficient to prove that Cooke's intent is to hinder or delay a creditor.  In re Retz, 606 F.3d at 1200 (citing In re Bernard, 96 F.3d at 1281).  Thus, our review focuses

-12-

on whether the court's finding that Cooke intended to hinder or delay Renshaw was clearly erroneous.[5]

The intent to hinder or delay "is a question of fact that requires the trier of fact to delve into the mind of the debtor and may be inferred from surrounding circumstances." In re Searles, 317 B.R. at 379 (citing Emmett Valley Assocs. v. Woodfield (In re Woodfield), 978 F.2d 516, 518 (9th Cir. 1992) (intent may be inferred from the circumstances surrounding the transaction in question)). Similarly, the debtor's "course of conduct may be probative of the question." Id. at 380 (citing Devers v. Bank of Sheridan (In re Devers), 759 F.2d 751, 753-54 (9th Cir. 1985).

**2. The bankruptcy court's finding that Cooke intended to hinder or delay Renshaw was not clearly erroneous.**

To begin, the bankruptcy court questioned Cooke's credibility based on his conflicting testimony about the AMCO Letter and the AMCO Payment. We give credibility findings great deference.

---

[5] The dissent's analysis doesn't consider intent, but rather questions whether any transfers contemplated by § 727(a)(2) occurred if the transfers constitute preferment of other creditors. See Hultman v. Tevis, 82 F.2d 940, 941 (9th Cir. 1936). As noted in First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986), the real issue in Hultman involved whether the debtor acted with the requisite intent when he "in good faith, believed and relied on his attorney's advice and acted on it in making the transfer to his son." Id. The Hultman court concludes no other indicia of intent existed, warranting a discharge. The facts in the present appeal distinguish this appeal from Hultman. Although Cooke vaguely raised an advice of counsel defense, he inconsistently testified as to whether he talked to his counsel. Further he declined to waive his attorney-client privilege so Hart could testify or submit a declaration as to his advice to Cooke. However, in raising such a defense, Cooke could not invoke an attorney-client privilege. Chevron Corp. v. Pennzoil Co., 974 F.2d 1156, 1163 (9th Cir. 1992).

-13-

In re Retz, 606 F.3d at 1196. The court noted that at trial Cooke testified he received and read the AMCO Letter prior to depositing the AMCO Payment. However, at his Rule 2004 examination Cooke testified that he did not recall receiving the AMCO Letter, he would not have received it if it was sent to his home address and he did not think Pamela had forwarded it to him at UCLA. The court also found contradictory Cooke's testimony about what steps he took after receiving the AMCO Payment to determine if the funds were his to spend. At trial, Cooke testified that he asked Hart, Pamela and AMCO if the check was his to keep and all said yes. At his first § 341(a) meeting, which was two months before Renshaw filed his adversary complaint, Cooke testified that he did not know exactly what the AMCO Payment was for, Hart did not inform him and he did not ask too many questions about it.

Cooke argues that no evidence was presented at trial that he actually intended to defraud or delay Renshaw. Cooke contends the evidence supports his position that the AMCO Payment was his to spend; no evidence showed or suggested that anyone told him, or that he had reason to believe, the AMCO Payment was being paid to him in trust to then be remitted to Renshaw.

Bankruptcy courts may infer a debtor's intent from surrounding circumstances and the debtor's course of conduct. In re Woodfield, 978 F.2d at 518; In re Devers, 759 F.2d at 753-54; In re Searles, 317 B.R. at 379-80. In addition to Cooke's conflicting testimony about the AMCO Letter and AMCO Payment — i.e., whether or not he read and/or discussed with anyone the AMCO Letter and/or the AMCO Payment before depositing the check and spending the funds — Cooke had also testified that he knew the

-14-

AMCO Payment was for accrued interest on the Judgment and that Renshaw might try to collect the money. During the trial, Cooke additionally stated he did not want Renshaw to have the AMCO Payment. Further, the record reflects that Cooke knew his policy limits of $250,000 would not satisfy the Judgment and that he was responsible for the excess of nearly $1.5 million. Even though the AMCO Payment belonged to Cooke, inferences from the facts and Cooke's course of conduct established that he knew that an aggressive judgment creditor like Renshaw would look to Cooke's assets for satisfaction, including the AMCO Payment. Moreover, as the bankruptcy court found, the debt to Renshaw was the reason Cooke filed his bankruptcy case; he had no other material debt on the petition date. Perhaps one of these facts standing alone would not prove Cooke's actual intent to hinder or delay Renshaw, but they were the facts and circumstances the bankruptcy court could consider in its subjective intent determination.

Cooke also takes issue with the bankruptcy court's findings that he was upset with Renshaw and, thus, wanted to keep the money away from Renshaw. As part of its intent finding, the bankruptcy court discussed Cooke's testimony at trial that he was upset about the Judgment, that he did not think he was fully responsible for the accident even after the Judgment was entered, that Renshaw was not entitled to the entire amount, and that he was contemplating bankruptcy prior to receiving the AMCO Payment. Cooke argues that anyone would be unhappy about such a significant judgment, particularly someone of his age, but that such distress does not constitute fraudulent intent. Again, this may be true. However, Cooke's testimony as to his state of mind about the Judgment

-15-

included more facts for the bankruptcy court to consider in its totality of the circumstances analysis in determining that Cooke had the intent to hinder or delay Renshaw from recovering all or any part of the AMCO Payment. This analysis is further buttressed by Cooke's admission that he did not want Renshaw to have any of the AMCO Payment.

Beyond the credibility determination, the bankruptcy court also identified several elements as support for the inference that Cooke acted with the requisite intent under § 727(a)(2)(A).[6] Again, the bankruptcy court in determining Cooke's intent was not required to identify or make any findings involving any fraudulent intent as this appeal involves a determination of intent to hinder or delay and not an intent to defraud. See In re Retz, 606 F.3d at 1200. Even if the court made such findings, they further identify acts supporting its determination of Cooke's intention to hinder or delay Renshaw's recovery. The court determined that it was evident from the AMCO Letter that Renshaw was pursuing collection of postjudgment interest from the Judgment. Renshaw had sued AMCO for the money, but dismissed his suit when he learned the funds were being sent to Cooke, who was warned by AMCO that Renshaw may try to collect them. The court further found that the AMCO Payment was Cooke's most significant asset, that it was received on the eve of bankruptcy and that two-thirds of the

---

[6] The bankruptcy court considered: "(1) the timing of the transfer; (2) the amount of the transfer in relation to the remaining property of the debtor; (3) whether the transfer occurred after the entry of a large judgment against the debtor; (4) whether the transfer rendered the debtor insolvent; (5) the debtor's motivation to make the transfers; and [6] the credibility of the debtor's explanation regarding the transfers." Trial Tr. (Jan. 12, 2015) 10:23-11:5.

-16-

funds were transferred just days before he filed. The record also reflected that Renshaw was Cooke's largest creditor, holding over 99% of the claims against the estate and that Cooke did not want Renshaw to have the money.

Finally, Cooke contends the bankruptcy court misapplied In re Bernard, 96 F.3d 1279 (9th Cir. 1996). Specifically, Cooke argues the bankruptcy court relied entirely on Bernard in determining whether he had the "intent to hinder or delay" Renshaw. Cooke contends this was in error because the facts in that case were significantly different from his own and the legal question did not involve intent. In making its ruling against Cooke, the bankruptcy court noted it was "a close case," and then went on to discuss the facts in Bernard:

> [T]he debtors . . . withdrew $64,000 from their money market account to avoid efforts by a creditor to collect on an $83,000 judgment, spent the money, and filed for Chapter 7 to discharge the judgment. After withdrawing the funds from the money market, the Ninth Circuit noted that the bankruptcy estate was 'virtually worthless' as a result of their actions. The Ninth Circuit confirmed a denial of discharge stating: "Denial of discharge is a harsh remedy; however, bankruptcy has its roots in equity and to get equity one must do equity." Bernard at page 1279.

Hr'g Tr. (Jan. 16, 2015) 14:9-21.

We agree the facts in Bernard are distinguishable in that "intent" was not at issue; the Bernards essentially admitted they withdrew the money market funds to fend off their creditor's attempt to reach their assets. 96 F.3d at 1282. The question in Bernard was whether the withdrawals were "transfers" of property within the meaning of § 727(a)(2)(A), which the Ninth Circuit answered in the affirmative, based on its broad interpretation of

-17-

the bankruptcy code's definition of the word "transfer."[7]  It appears the bankruptcy court was relying on Bernard for the proposition that Cooke's expenditure of the AMCO Payment constituted "transfers" beyond that of legitimate prebankruptcy planning, which supported an inference of Cooke's subjective intent.  Nevertheless, we perceive no error.

While Bernard may not be on "all fours" with Cooke's case, it is clear from the record the bankruptcy court applied the correct law.  It articulated the correct elements for a claim under § 727(a)(2)(A) and made the necessary findings.  The court also properly relied upon inferences and course of conduct that may be considered in determining a debtor's actual intent.  Although two views of the evidence may exist, the court's choice between them in determining that Cooke actually intended to hinder or delay, cannot be clearly erroneous.

## VI. CONCLUSION

While each of us individually may have reached a different conclusion in this case, and clearly the dissent would have, we perceive no clear error with respect to the bankruptcy court's

---

[7]  The dissent asserts that the analysis in this appeal is independent of the bankruptcy court's finding of intent and relies on the interpretation of the word "transfers"; a legal issue reviewed de novo and not a factual determination of the word "intent," which is reviewed for clear error.  The Ninth Circuit in In re Bernard, 96 F.3d at 1282-83, concluded that the Bankruptcy Code's definition is "**extremely** broad," including bank deposits and withdrawals.  See § 101(54).  Definitionally, "transfers" are not categorized by whether the property transferred may be exempted under § 522 or whether the property may be equivalent to permitted distributions of property of the estate under § 726 or some other operative bankruptcy statute.  The transfers involved in this appeal occurred prepetition and involve property of the debtor.  In the requisite analysis for this appeal, we need to determine if the bankruptcy court's finding of actual intent was clear error.

-18-

finding that Cooke actually intended to hinder or delay Renshaw; such finding is not illogical, implausible or without support in the record. Any potential legal error by the bankruptcy court in its application of <u>Bernard</u> was harmless and certainly does not compel a reversal of the discharge judgment; the correct law was applied in this case. Accordingly, we conclude the bankruptcy court did not err when it denied Cooke's discharge under § 727(a)(2)(A), and we AFFIRM.

Dissent begins on next page.

TAYLOR, Bankruptcy Judge, Dissenting:

I acknowledge that we review intent findings for clear error. And I understand that where two plausible views of the facts exist we cannot reverse. But, nonetheless, I find reversible error here; I respectfully dissent.

I do not contest the bankruptcy court's determinations as to the preliminary facts of this case; they are not controversial. On *de novo* review where appropriate in connection with a denial of discharge, however, I cannot conclude that the bankruptcy court correctly took into consideration all the "applicable rules" required in consideration of a § 727 claim by binding Ninth Circuit authority. And given that conclusion, I cannot on appropriate *de novo* review agree that it correctly applied the facts to these rules.

I discuss my reasoning in detail hereafter, but, in short, I never reach the question of intent because I see no "transfer" that appropriately supports a discharge denial given established Ninth Circuit authority.

Even if I review the bankruptcy court's intent findings, I conclude that remand is necessary. In particular, the record reveals that the bankruptcy court's findings regarding Cooke's state of mind were based in very significant measure on its erroneous assumption that Cooke paid taxes prior to bankruptcy that he could not discharge in his chapter 7 case. Its assumption in this regard was in error. The majority simply ignores this significant error which was the apparent linchpin of the bankruptcy court's state of mind findings. I conclude that, at a minimum, remand is required.

-1-

**Undisputed Facts**. It is undisputed that Cooke lacked resources to pay Renshaw's judgment in full or even in any significant way. There is no evidence that he would ever be able to retire this debt, especially given the interest accrual which is well in excess of $100,000 a year.

Cooke, at some point, decided that he needed to file a bankruptcy. The decision to file bankruptcy is subject neither to question nor to recrimination - it certainly does not justify denial of discharge even where the only reason for filing is to halt the collection efforts of a creditor.

There is no evidence that Cooke was intoxicated at the time of the accident and, thus, no argument that § 523(a)(9) bars discharge. Renshaw's injuries were horrific, but that does not change the calculus. Congress has made a hard decision, and the Bankruptcy Code allows discharge of a judgment arising from negligence where a debtor acts appropriately in the bankruptcy process. Thus, Cooke had the right to discharge his debt to Renshaw through a chapter 7 case.

Cooke's problems in the bankruptcy arose because his insurance company did not promptly pay the judgment to the extent of his policy limits. As a result, it was liable to Cooke, not to Renshaw, for the interest that accrued on the judgment prior to payment, $45,147.62; it paid this amount directly to Cooke. His pre-petition use of a portion of what the bankruptcy court acknowledged was his own money (the "Funds") is what we must evaluate.

So the question becomes: what did Cooke do with the Funds that would justify the loss of discharge? The answer, I submit,

is that he did nothing that was an appropriate basis for discharge denial under § 727(a)(2)(A).

**The bankruptcy court made no finding of fraud, and I see no evidence of fraud or other similar nefarious conduct supporting a discharge denial on this record.** The bankruptcy court based its decision exclusively on the determination that Cooke's actions were intended to hinder and delay Renshaw. It found no basis for a determination that this case involved fraud; I agree. There is no evidence that Cooke hid money or assets, paid fake or inflated claims, initiated fraudulent transfers, or attempted to retain access to the Funds post-bankruptcy in a manner inconsistent with the Bankruptcy Code. This is important because the absence of fraud - or anything even close to fraud - makes this case distinguishable from the vast majority of reported § 727(a)(2)(A) cases based on a determination that a debtor hindered or delayed creditors.[1] The bankruptcy court and the majority fail to cite a

_____

[1] Having reviewed numerous reported and unreported decisions from circuit courts and bankruptcy appellate panels affirming denial of discharge on account of actions that hinder or delay creditors, I find no case that did not involve conduct that did not include deceit, non-disclosure, transfer of assets without consideration, inappropriate pre-payment, excessive collateralization, or similar conduct. Looking only at reported Ninth Circuit and Panel decisions provides a representative example of the national scope of cases where denial of discharge was appropriate under § 727(a)(2)(A) and based on a determination that the debtor hindered or delayed creditors. Adeli v. Sachs (In re Adeli), 384 F. App'x 599 (9th Cir. 2010) (assets moved into name of a friend to shield them from creditor claims); Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279 (9th Cir. 1996)(money withdrawn from bank account, not paid to any creditor, and then spent on a future vacation and gambling); Wolkowitz v. Beverly (In re Beverly), 374 B.R. 221 (9th Cir. BAP 2007) aff'd in part, dismissed in part, 551 F.3d 109 (9th Cir. 2008) (collusive marital settlement agreement stripped debtor of all non-exempt assets and fraudulent transfers); Beauchamp v. Hoose (In re Beauchamp),
(continued...)

-3-

single reported Ninth Circuit or Panel decision where a court denied discharge based on efforts to hinder or delay that did not involve deceit or other objectively or subjectively improper conduct.

**Renshaw did not have a lien on the Funds or a right to priority payment from the Funds.** It is important to put to rest a theme that pervades Renshaw's position on appeal and that may have influenced the bankruptcy court improperly. Implicit in his argument is the assertion of entitlement to the Funds. Express in his argument is the claim that they should have been paid to him. The problem with this assertion is that it is not based on any law, state or federal.

As Renshaw conceded during oral argument, the Funds were not encumbered by any lien in his favor prior to bankruptcy; state law does not provide for such a lien automatically, and Renshaw had not otherwise acquired a judgment lien on the Funds. There is no evidence or argument that Cooke impeded Renshaw during the prepetition period.

Renshaw, ignoring these realities, first claimed entitlement to the Funds as a third party beneficiary of the contract between Cooke and his insurer; neither state law nor the Bankruptcy Code nor the bankruptcy court recognized this alleged interest. The

---

[1](...continued)
236 B.R. 727 (9th Cir. BAP 1999), aff'd, 5 F. App'x 743 (9th Cir. 2001) (checks deposited in a hidden account); Lawson v. Hughes (In re Lawson), 193 B.R. 520 (9th Cir. BAP 1996), aff'd, 122 F.3d 1237 (9th Cir. 1997) (assets transferred to mother while debtor retained a beneficial interest); Aubrey v. Thomas (In re Aubrey), 111 B.R. 268 (9th Cir. BAP 1990) (no evidence supported assertion that transfer was based on a legitimate obligation as opposed to an attempt to put assets beyond creditors' reach).

-4-

Funds were compensation to Cooke for the damages he suffered in the form of interest accrual as a result of his insurer's failure to pay immediately - at least to the extent of his policy limits.

Ultimately, Renshaw conceded in oral argument that his claim was based on an alleged "moral obligation." I appreciate the point, but neither the California legislature nor Congress allow us to determine rights based on our perception of the moral superiority of one claim over another. The law, in general, and the Bankruptcy Code, in particular, create mandates and establish priorities between similarly situated creditors; and there may well be a moral element undergirding some of this legislation. But here no such priority existed, and, until Renshaw created a lien, he had no greater right to this money under either state or federal law than any other creditor.

Similarly, as a matter of law, Cooke had no legal obligation to turn the Funds over to Renshaw, was entitled to exempt a portion of the Funds from any judgment lien, and was entitled, within limits, to use the Funds for other purposes. My review of the bankruptcy court's oral ruling causes me to question whether the bankruptcy court gave improper weight to this moral imperative argument. The bankruptcy court noted that there was an admission that Cooke knew that he was responsible for interest on the debt and that he received the Funds on account of interest accrual. To the extent the bankruptcy court equated the general entitlement to interest on a judgment with a legal requirement that Cooke pay the Funds to Renshaw, that was legal error.

**Use of the Funds to pay an appropriate fee to an attorney to initiate a bankruptcy case cannot be a basis for a denial of**

**discharge under § 727(a)(2)(A).** It is the rare case where a debtor does not file a bankruptcy with the express intent of delaying and hindering at least one and sometimes all of his creditors. The automatic stay has that effect any time it stops a foreclosure, garnishment, or other collection activity. If payment to an attorney from free and clear funds for the purpose of initiating a bankruptcy is a transfer for § 727(a)(2)(A) purposes, then discharge would be unobtainable for most, if not all, debtors who retain counsel to assist them in filing a bankruptcy. Such a construction of § 727(a)(2)(A), thus, is nonsensical.

Here, there is no evidence that the attorney's fees were unreasonable in amount or transferred with an improper intent. Again, this was not a fraud case. To the extent the bankruptcy court included this payment as a transfer for § 727(a)(2)(A) purposes, this was error.[2]

**Binding Ninth Circuit authority and prior decisions of this Panel make clear that use of the Funds to pay other creditors cannot be considered an independent basis for a § 727(a)(2)(A) discharge denial.** In Hultman v. Tevis, an Act case, the Ninth Circuit stated as follows: "The mere fact that a bankrupt has made

---

[2] In an unreported decision, Perrine v. Speier (In re Perrine), 2008 WL 8448835 (9th Cir. BAP 2008), the Panel did rely on a transfer to an attorney as a basis for denial of discharge under § 727(a)(2)(A). There, however, the transfer was not solely or even largely on account of legal services either actually provided or reasonably anticipated. Id. at *5. Indeed, as of the time of decision, the fees had still not reached the level of the transferred funds. See id. Here, the fee appears reasonable based on my knowledge of the rates charged in Southern California for chapter 7 cases; and the record contains no evidence to the contrary.

-6-

a preferential payment or transfer to one of his creditors is no ground for denying a discharge." 82 F.2d 940, 941 (9th. Cir. 1936) (citations omitted). The debtor had transferred "large sums" to his son during the year prior to bankruptcy allegedly with the intent to hinder, delay, or defraud other creditors. Id. The Ninth Circuit declined to determine whether this transaction had a detrimental impact on other creditors and disregarded the fact that the transaction involved preferment of an insider. Instead, it focused on the undisputed fact that the debtor owed his son $50,000 at the time of the transfer and that the payments, though substantial, failed to pay this debt in full. Thus, it found discharge appropriate.

Hultman remains good law and bound the bankruptcy court here. Indeed, the Panel previously considered the continuing impact of Hultman and required far more than preferment of a creditor in a discharge denial situation. See In re Perrine, 2008 WL 8448835, at *5 (evidence that a transfer to attorney exceeded value of services and, thus, was for a purpose other than debt repayment and removed only asset from reach of creditors justified conclusion that Hultman was inapplicable and that discharge denial was appropriate).

At least one other circuit court has articulated a rule similar to that stated in Hultman in a case decided under the Code. See Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 307 (11th Cir. 1994).[3] In Miller, the debtor transferred property

_____

[3] Hultman relied on decisions, from other circuits, which stated this rule in a case decided under the Act. See 82 F.2d at (continued...)

-7-

to a close business colleague in exchange for cancellation of debt. See id. at 304. The evidence suggested that the property was worth more than the debt. Id. at 307. The Eleventh Circuit agreed with the bankruptcy court, however, that discharge denial was not supported by this fact, stating that: "A mere preferential transfer of this sort is not tantamount to a fraudulent transfer for the purposes of denying discharge." Id. It also distinguished the case from those involving transfers to non-creditors. Id.

**The bankruptcy court here did not acknowledge the rule in Hultman and erroneously relied on Cooke's use of the Funds to pay other creditors.** The bankruptcy court and the Panel majority turn a blind eye to this binding precedent. In footnote 5, the majority attempts to avoid the requirement that it follow Hultman by arguing that the "real" issue in that case was the debtor's intent and the evidence supporting a lack of intent to hinder or delay when the debtor relied on advice of counsel. Maj. Op. at 13 n.5. I agree that this was one basis for the Ninth Circuit's decision in Hultman, and I agree that the evidence that Cooke acted on advice of counsel is not strong. If this was the sole reason for the Ninth Circuit's ruling in Hultman, it would not bar affirmance here. I, however, cannot agree with the majority's decision to simply disregard the other basis for the relevant ruling in Hultman.

---

[3](...continued)
941 (citing Rutter v. General Motors Acceptance Corp., 70 F.2d 479, 481 (10th Cir. 1934); In re Ricther, 57 F.2d 159, 160 (2nd Cir. 1932); Bailey v. Ross, 53 F.2d 783, 784 (8th Cir. 1931)).

-8-

After making the point emphasized by the majority, Hultman then stated as follows:

Furthermore, the amount of money so transferred was less than the amount then owing by the bankrupt to his son. The mere fact that a bankrupt has made a preferential payment or transfer to one of his creditors is no ground for denying a discharge.

82 F.2d at 941.

"Furthermore" indicates that this reason for affirmance is additional to the only point the majority chooses to consider. Hultman clearly states that payment of legitimate creditor claims, even to insiders, is not a basis for discharge denial. Both the bankruptcy court and the majority ignore this authority; I cannot and do not do so.

Almost all of Cooke's transfers[4] paid other debts. Renshaw had the burden of proof and provided no evidence that these payments did not relate to legitimate debts. Thus, the bankruptcy court's reliance on Cooke's payments to other creditors as "transfers" within the meaning of § 727(a)(2)(A) was error.

First, the payments of debt were not to insiders; Cooke paid his bankruptcy lawyer, paid his taxes, and paid his college tuition and housing expenses. The argument that his mother had paid his college expenses in the past is irrelevant. There is no evidence that she had a legal obligation to do so in the future.[5] The case law does not allow a bankruptcy court to change the

---

[4] In footnote 7, the majority correctly states that the term transfer is broadly construed. I agree, and I agree that Cooke made transfers. But, as the Ninth Circuit made clear in Hultman, some transfers do not support discharge denial as a matter of law.

[5] Further, as discussed below, when Cooke did so, he used money for which he had an available exemption.

-9-

quality of the UCLA bills as debt just because Cooke had a loving parent who might be willing to pay his obligations. The focus here is on what Cooke owed. As a result, this is a stronger case than Hultman, which involved direct payment to an insider.

Second, taxes enjoy special protection under the Bankruptcy Code. Congress has determined that taxes should be paid even if this leaves a deserving creditor such as Renshaw unpaid. Here, the bankruptcy court found that the taxes arose in connection with the Funds themselves. There was no evidence that Cooke overpaid the taxes.

Third, as already discussed, the payment of an appropriate fee to a bankruptcy attorney in connection with a chapter 7 case cannot be the basis for a § 727(a)(2)(A) denial of discharge. The rule in Hultman, thus, provides additional but not exclusive support for the conclusion that this payment should not have been a basis for discharge denial.

The bankruptcy court erred when it based its decision on Cooke's payment of these legitimate obligations. In inferring an inappropriate intent to hinder or delay, it focused on the total amount of pre-petition payments from the Funds. But its consideration of over 90% of this amount was improper under the rule established by the Ninth Circuit in Hultman. And this error was not harmless.

The bankruptcy court failed to consider Hultman and, instead, relied on Bernard as analogous. As the majority concedes, nothing could be farther from the case; the debtors in Bernard depleted funds putting them beyond the reach of all creditors. Here, Cooke

-10-

merely preferred certain creditors.[6]  This did not justify a § 727(a)(2)(A) denial of discharge.

**Even if the taxes were not payable when paid, the outcome is the same as they were entitled to priority treatment in a chapter 7 case**.  While there is no evidence from Renshaw, who had the burden of proof, that the taxes were pre-paid, a common sense argument can be made that the taxes - which relate to Cooke's receipt of the Funds - were not due when paid.  The question then becomes whether that fact takes those payments outside the rule articulated in <u>Hultman</u>.  I assert that it does not.

Income tax liability arises at the end of the tax year; typically, the last day of the tax year.  <u>See</u> <u>Towers v. United States (In re Pac.-Atl. Trading Co.)</u>, 64 F.3d 1292, 1295, 1301 (9th Cir. 1995).  But there is a possible exception when an individual files a chapter 7 case and there are assets available for distribution.

Section 1398(d)(2)(A) of the Internal Revenue Code allows a debtor in an asset case to elect to bifurcate the bankruptcy-filing year into two tax years and to terminate the first tax year on the petition date.  The tax debt accruing prior to the petition date is then treated as pre-petition debt and is available for treatment as a priority claim under § 507.  Because the Internal Revenue Code allows this treatment for federal tax liability, the Bankruptcy Code mandates the same tax treatment for state income taxes.  <u>See</u> 11 U.S.C. § 346(a).

---

[6] And, as discussed hereafter, to the extent of his taxes, he did so exactly as the Bankruptcy Code allows.  While, in the case of the transfers to parties other than his attorney, he used exempt assets.

-11-

In paying tax liabilities, albeit prior to bankruptcy, Cooke merely duplicated the treatment that these taxes would have received if he held onto all of the Funds and took them into his bankruptcy estate. Again, pre-petition payment of a legitimate tax debt - payable in full as a priority in a chapter 7 case - does not support a § 727(a)(2)(A) denial of discharge.

The bankruptcy court erred when it ignored the treatment the taxes would have received in an asset case. In its findings, the bankruptcy court erroneously concludes that Cooke paid the taxes "to avoid any non-dischargeable claims that would result after his petition was filed." Hr'g Tr. (Jan. 16, 2015) at 14:3-5. This finding assumes that the taxes would not receive priority treatment in an asset case; such an assumption, again, was erroneous. And there is no evidence in the record that Cooke paid the taxes based on an erroneous view of the law. The only evidence in the record even remotely related to his understanding of his tax obligations is the fact that he generally had access to an accountant. There is nothing that supports the bankruptcy court's conclusion that, in effect, Cooke paid his taxes based on an erroneous view of the law.

The bankruptcy court's error as to the dischargeability of the taxes related to the Funds was not harmless; it painted the pre-petition tax payments as opportunistic and unduly beneficial to Cooke. Because of the provisions of the Bankruptcy Code and the Internal Revenue Code, the payment of taxes was neither. The majority ignores this error entirely.

**Cooke's replacement of his laptop did not, in isolation, justify a denial of discharge.** The undisputed evidence before the

-12-

bankruptcy court was that Cooke's prior computer was five to six years old, that the screen had recently cracked and broken, and that Cooke was a college student who needed a computer. Trial Tr. (Jan. 12, 2015) at 57:21-23. Nefarious conduct, this was not.[7]

The record does not reflect that the bankruptcy court considered this purchase in isolation, but if it denied discharge based solely on this use of the Funds, I submit that this was error. Such a conclusion turns the strong policy in favor of discharge on its head.

Moreover, the Ninth Circuit allows debtors to engage in some forms of pre-bankruptcy planning and to protect assets by converting them from non-exempt to exempt. See, e.g., Gill v. Stern (In re Stern), 345 F. 3d 1036, 1043 (9th Cir. 2003) ("[T]he purposeful conversion of nonexempt assets to exempt assets on the

---

[7] As previously noted, I do not reach the bankruptcy court's intent findings in my decision to reverse. I acknowledge that the bankruptcy court found a lack of credibility in one area, which the majority appears to determine was not erroneous, but nothing in the record suggests that this finding related to the testimony regarding the state of Cooke's computer. This evidence was neither contradicted nor controversial.

I also note that I find the credibility findings troubling. There is some discord in Cooke's various discussion of when, whether, and how he got confirmation that he was free to spend the Funds. My problems with this whole area of testimony, however, are several. First, the § 341(a) meeting testimony ends with a question related to this topic and, according to the transcript, an inaudible response. Next, the questions seem to ignore that his mother was copied on the letter from the insurance company explaining relevant points. But most importantly, this seems to be a tempest in a teapot. Cooke received the Funds in his own name and there is no question that he had the legal right to use them. Similarly, Cooke knew that he owed Renshaw on the judgment and there was no suggestion that he naively believed that Renshaw would not seek payment. Cooke had no duty to double check before using the Funds and his use was for legitimate purposes. The bankruptcy court did not find Cooke to lack credibility for all purposes, and nothing in the credibility finding suggests that I adopt a more expansive view of his lack of credibility and disregard his testimony regarding his computer.

-13-

eve of bankruptcy is not fraudulent per se." (quoting <u>Wudrick v. Clements</u>, 451 F.2d 988, 989 (9th Cir. 1971)). The bankruptcy court here acknowledged this fact, stating that this was a close case, but finding that combined expenditures from the Funds tipped the balance towards a denial of discharge. In a close case, the bankruptcy court could not find that the purchase of a much-needed tool of Cooke's trade as a student, one that involved use of less than ten percent of the Funds, justified discharge denial.[8]

**Reversal is warranted as a matter of law because the bankruptcy court's factual finding of intent was based on transfers which it could not consider for purposes of § 727(a)(2)(A).** In summary, I would reverse because the bankruptcy court erred as a matter of law when it based its decision almost entirely on Cooke's payment of other debt. <u>Hultman</u>, as recognized by this Panel, does not permit this reliance. I also conclude that the laptop computer acquisition in isolation did not justify § 727(a)(2)(A) denial of discharge.

I emphasize that my analysis is independent of the bankruptcy court's finding of intent. As already noted, all commencements of bankruptcy cases involve, to some extent, an express intent to hinder and delay a creditor. Further, almost all bankruptcy cases

---

[8] Cooke exempted most of the laptop computer's value as a tool of the trade in his case; this was a classic transfer of non-exempt assets to exempt assets. Any additional value remained available to his creditors, so arguably only the $1,500 that he claimed as exempt is properly considered as a transfer. Further, as discussed hereafter, he actually used some otherwise exempt portions of the Funds to make this purchase. So, in part, this was simply a change of the form of exempt assets. The math of the transaction is discussed more thoroughly hereafter, but any "transfer" related to the asset involved only a negligible portion of the Funds that was not otherwise exempt.

-14-

involve some measure of transfer in anticipation of the creditor-hindering-or-creditor-delaying bankruptcy; bankruptcy lawyers are paid, creditors are preferred, and in some reasonable regards non-exempt assets become exempt or goods or services essential to day-to-day existence are obtained. These types of transfers do not justify a denial of discharge, so one never need consider a debtor's intent when causing them. And Hultman provides a firm foundation for a determination that not all transfers are appropriately considered in a § 727(a)(2)(A) context. Adeeb is another such case.

In Adeeb, the debtor admitted to making pre-petition transfers with improper intent. 787 F.2d at 1341-42. But, he repented and attempted to retrieve the assets. Id. The Ninth Circuit, thus, reversed the district court and remanded to the bankruptcy court for a determination as to whether recovery had been complete. Id. at 1346. The Ninth Circuit read transferred in § 727(a)(2)(A) as meaning "transferred and remained transferred." Id. at 1345. And it noted that Congress intended to deny discharge where debtors took actions **to keep assets from their creditors** by hiding assets or destroying them. Id. The facts here evidence no such improper conduct. Instead, as in Hultman, the transfers did not support § 727(a)(2)(A) discharge denial.

Were we writing on a blank slate, I might join in the majority's decision, but we are not. The Ninth Circuit in Hultman and Adeeb made clear that not every transfer supports a § 727 objection to discharge. The majority ignores this precedent as did the bankruptcy court.

-15-

**Reversal is also appropriate here because the transfers at issue did not impact Renshaw in any way appropriately recognized by law.** Relying on Adeeb, in Bernard the Ninth Circuit determined that injury was not an element of a § 727(a)(2)(A) claim. 96 F.3d at 1281-82. But see id. at 1283 (O'Scannlain, J., dissenting) ("I read Adeeb as holding only that lack of injury to creditors is irrelevant for purposes of denying a discharge in bankruptcy.") (internal quotation marks and citation omitted). Having acknowledged that, I would still reverse here because, as stated, the transfers at issue almost entirely duplicated the treatment Renshaw would have received if Cooke paid his attorney and brought the entirety of the Funds into his chapter 7 estate. I would conclude as a matter of law that where the pre-petition transfers merely facilitate the filing of a bankruptcy by paying an attorney to file the case and then almost entirely duplicate the treatment that creditors would receive under the Bankruptcy Code that they cannot be considered in isolation as transfers that justify denial of discharge.

The record makes clear that Cooke understood that he had a wildcard exemption under state law, among others, and that he intended to use it to protect his rights to the Funds. Here, on the petition date, the California wildcard exemption totaled $23,250. Thus, if one considers only these two factors, the most that would have been available to his estate if Cooke filed bankruptcy and brought all of the Funds, net of the payment to the attorney, into the case is $17,592. This creates an asset case, but there are two relevant consequences of that fact here.

First, the Trustee would be entitled to his statutory fee

-16-

which can be approximated at $2,500 pursuant to § 326(a) if the estate was an asset estate holding about $17,590 for distribution. This left approximately $15,092 available to creditors.

And the second reality is that, as discussed above, the taxing authorities would have a priority claim to this amount. Tax claims based on Cooke's accountant's calculation totaled $11,000 payable to the IRS and $2,800 payable to the California Franchise Tax Board. Thus, tax debt would be payable from almost all remaining non-exempt funds. The balance of approximately $1,292 would be further reduced by Trustee expenses and admittedly small payments to other creditors. It is unclear that Renshaw would have received anything.

What this analysis shows is that unless the real point of Renshaw's argument is that Cooke wasn't entitled to file bankruptcy or that Cooke was obligated to pay the Funds to him prior to filing (a payment that would be recoverable as a preference), the transfers of the Funds were not in any cognizable way a deviation from the treatment he otherwise would have received in Cooke's chapter 7 case.

Where Cooke made transfers that are entirely consistent with the priorities under the Bankruptcy Code or, in the case of UCLA and the laptop, where the transfers were made almost entirely from funds that Cooke could claim as exempt, a determination of discharge denial was reversible error.

Here, the bankruptcy court concluded that Cooke's use of the money was intended "to maximize the benefit of the [F]unds received for himself." Hr'g Tr. (Jan. 16, 2015) at 15:1-2. Again, this conclusion was a negative one allegedly supporting

-17-

discharge denial. But here all Cooke did was to pay an attorney to file his bankruptcy, pay taxes as allowed by the Bankruptcy Code, make other payments from assets for which he had an available state law exemption, and use a tiny portion of the non-exempt funds to acquire an exempt asset necessary for his work as a student. Such intended use of funds does not support discharge denial unless we expand § 727(a)(2)(A) to a point unsupported by case law and requiring a nonsensical interpretation of the statute.

**In any event, if reversal is not appropriate, remand is required.** The majority disagrees with my conclusion that the transfers here are not appropriately considered for § 727 purposes. I respectfully disagree with their analysis. But even if I were to agree that the transfers were properly considered, I remain incapable of affirmance. If reversal is not the correct result, remand is required.

The bankruptcy court specifically determined that Cooke paid the taxes in order to avoid an otherwise nondischargeable debt. In doing so, however, the bankruptcy court did not refer to any testimony or evidence, documentary or otherwise, in the case. And, in fact, the bankruptcy court could not have relied on any such evidence because no such evidence exists in the record. Instead, the bankruptcy court plucked a motive from the air and inferred that it was Cooke's.

In deferring to the bankruptcy court's discretion in this regard, the majority goes too far. They rubber stamp the bankruptcy court's inference of wrongful intent when the Bankruptcy Code and Internal Revenue Code make clear that Cooke

-18-

had no risk of nondischargeable tax debt if he brought the Funds into his bankruptcy estate. Put more bluntly, the bankruptcy court inferred, based on not a shred of evidence, that Cooke made these payments based on the erroneous belief that the tax claims would be nondischargeable. As these payments constitute the majority of the payments made pre-bankruptcy, remand is appropriate so that the bankruptcy court can reconsider its determination that Cooke made all payments with the intent to hinder or delay Renshaw in light of the tax treatment required by law in a chapter 7 asset case.

**The testimony regarding Cooke's understandings about the Funds and feelings about payment to Renshaw do not sufficiently support affirmance on this record.** The majority and the bankruptcy court, make much of allegedly inconsistent testimony by Cooke. My review of the record leads me to question this assumption as already discussed. Among other things, the questions asked at the § 341(a) meeting, in deposition, and at trial are subtly, but significantly, different.

The majority, but not the bankruptcy court, also rely on the trial testimony that concludes as follows:

Q. I'm sorry. Excuse me. You didn't want Mr. Renshaw to have that money, did you?

A. I didn't . . . .

An ellipsis generally indicates an omission of words. This was not a firm statement, and the majority reaches too far when it converts this apparently incomplete or equivocal statement into "an admission that [Cooke] did not want Renshaw to have any of the [Funds]." Maj. Op. at 18; see also id. at 16. This testimony

-19-

gives me no comfort in affirming the bankruptcy court.

First, the majority turns it into a specific declarative statement. That, simply, is not the case, as the party transcribing the testimony used an ellipsis, not the period appropriate with a firm declaration of state of mind.

Second, the bankruptcy court did not mention this testimony in its ruling. The majority, thus, gives this equivocal response a weight beyond that found appropriate by the trial court which heard the testimony and was able to observe demeanor and hear tone.

Third, the question asked and the response given merely relate to desire to pay; this is not an admission of intent to hinder or delay.

To be clear, were this the only disagreement I have with the majority's analysis, it would be a minor one. But given the fundamental problems I have described, I merely point out that I view any differences in testimony as essentially nonexistent and the equivocal testimony as to desire to pay as immaterial. This testimony does not allow me to overlook what I believe to be legal error.

I would reverse or, at a minimum, remand.